## JUSTINIAN RWEYEMAMU *v.* COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES ET AL.
### (AC 27108)

Flynn, C. J., and Gruendel and Peters, Js.

---

Argued September 21----officially released December 12, 2006

*Harold H. Burbank II,* for the appellant (plaintiff).

*Charles Krich,* principal attorney, for the appellee (named defendant).

*Meredith G. Diette,* for the appellee (defendant Roman Catholic Diocese of Norwich).

*Opinion*

PETERS, J. The first amendment to the United States constitution protects religious institutions from governmental interference with their free exercise of religion.[1] Accordingly, many courts have recognized a ministerial exception to judicial authority to adjudicate employment disputes between religious institutions and their religious leaders. In this case, the commission on human rights and opportunities (commission) invoked the ministerial exception to conclude that it lacked subject matter jurisdiction to hear allegations of employment discrimination brought by a Catholic priest against his diocese. We must decide whether the trial court properly dismissed the priest's appeal from the dismissal of his administrative complaint. The priest argues that for prudential reasons buttressed by a recent decision of the United States Court of Appeals for the Second Circuit, we should decline to recognize a ministerial exception to the jurisdiction of the commission. We disagree and affirm the judgment of the trial court.

On April 25, 2005, the plaintiff, Father Justinian Rweyemamu, a Roman Catholic priest, filed a revised administrative appeal to the trial court to challenge the validity of a decision by the defendant commission to dismiss his complaint of discriminatory employment practices on jurisdictional grounds. His administrative complaint

---

[1] The free exercise clause of the first amendment to the United States constitution provides: "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof . . . .*" (Emphasis added.)

alleged that the defendant, the Roman Catholic Diocese of Norwich (diocese), had engaged in discriminatory employment practices in violation of General Statutes § 46a-60.[2] The trial court concluded that neither state agencies nor state courts have subject matter jurisdiction to review purely ecclesiastical disputes. Accordingly, it dismissed the plaintiff's appeal.

In his appeal to this court, the plaintiff's principal claim is that the commission and the trial court improperly invoked a ministerial exception to administrative jurisdiction because Connecticut law has never recognized such an exception. In the alternative, he claims that the jurisprudential underpinnings of the ministerial exception have been dispositively demonstrated to be flawed in a binding decision of the Second Circuit, *Hankins* v. *Lyght*, 441 F.3d 96 (2d Cir. 2006). We are not persuaded.

I

We begin our analysis of the plaintiff's principal claim that the commission should have exercised jurisdiction by setting forth our standard of review. "Jurisdiction of the subject-matter is the power [of the court] to hear and determine cases of the general class to which the proceedings in question belong. . . . A court has subject matter jurisdiction if it has the authority to adjudicate a particular type of legal controversy. . . . It is a familiar principle that a court which exercises a limited

---

[2] General Statutes § 46a-60 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section: (1) For an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness . . . ."

and statutory jurisdiction is without jurisdiction to act unless it does so under the precise circumstances and in the manner particularly prescribed by the enabling legislation. . . .

"This concept, however, is not limited to courts. Administrative agencies [such as the commission] are tribunals of limited jurisdiction and their jurisdiction is dependent entirely upon the validity of the statutes vesting them with power and they cannot confer jurisdiction upon themselves. . . . We have recognized that [i]t is clear that an administrative body must act strictly within its statutory authority, within constitutional limitations and in a lawful manner. . . . It cannot modify, abridge or otherwise change the statutory provisions, under which it acquires authority unless the statutes expressly grant it that power." (Internal quotation marks omitted.) *Figueroa* v. *C & S Ball Bearing*, 237 Conn. 1, 4, 675 A.2d 845 (1996). "We . . . note that because [a] determination regarding [an agency's] subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) *Salmon* v. *Dept. of Public Health & Addiction Services*, 58 Conn. App. 642, 649, 754 A.2d 828 (2000), rev'd on other grounds, 259 Conn. 288, 788 A.2d 1199 (2002).

Our starting point for determining whether the commission properly relied on the ministerial exception to decline to exercise subject matter jurisdiction over the plaintiff's complaint is the affidavit that the plaintiff filed to initiate these proceedings. The plaintiff alleged that he was a "black African ordained Catholic priest from Tanzania, East Africa who [had] been employed by [the diocese] as a priest for over ten years in the position of parochial vicar; the last five of which [had been] at St. Bernard's Church, Rockville, Connecticut." He further alleged that he had been refused a promotion to the position of administrator for St. Bernard's parish

and that a less-qualified, white deacon had been appointed in his place.

The plaintiff also alleged that the diocese had harassed him about his role in working for a nondenominational, nonprofit organization called Buguruka Orphan and Community Economic Development, Inc. (organization). The plaintiff claimed that the diocese "has demanded, and continues to demand to date, through its top administrator, Bishop Michael Cote, to investigate [the organization] by interviewing me about [the organization] in Bishop Cote's office, under alleged but *canonically* incorrect church authority . . . ." (Emphasis in original.)

The plaintiff further alleged that the diocese had engaged in race, ethnicity, national origin and alienage based discrimination when it failed to promote him on April 7, 2004, and August 27, 2004. Additional alleged instances of discrimination, beginning on March 30, 2004, included poor evaluations, retaliation and harassment.

The commission's dismissal of the plaintiff's complaint for lack of subject matter jurisdiction was based on its recognition that "the courts and the commission recognize a 'ministerial exception' with respect to individuals employed by religious institutions in a 'clergy' or 'ministerial' capacity. The commission and the courts have determined that such are the 'lifeblood' of the church, and any government [interference] between a church and its ministers would violate the first amendment to the constitution."

The trial court upheld the commission's application of the ministerial exception as reflected in federal antidiscrimination statutes and case law. The court decided that the ministerial exception grants "religious institutions . . . the authority to manage their internal affairs, select their leaders without interference and

resolve their own disputes." The court concluded that "[t]he case before [it] involve[d] the basic and fundamental question of who will preach from the altar and who will occupy the rectory at St. Bernard's. The very nature of the question in and of itself makes it clear that this court lacks jurisdiction. Whether it comes from the priest, rabbi or clergyman or from an administrative agency such as the [commission], the court is without jurisdiction to interfere."

The issue of whether the ministerial exception applies to Connecticut's employment discrimination laws is one of first impression for our appellate courts. Like the federal government in its enactment of Title VII, 42 U.S.C. § 2000e et seq., Connecticut prohibits discrimination in employment. General Statutes § 46a-60. When interpreting § 46a-60, our Supreme Court has "often looked to federal employment discrimination law for guidance in enforcing our own [antidiscrimination] statute." (Internal quotation marks omitted.) *Thames Talent, Ltd.* v. *Commission on Human Rights & Opportunities*, 265 Conn. 127, 139, 827 A.2d 659 (2003).

As the United States Court of Appeals for the District of Columbia Circuit has observed, "[t]he ministerial exception is judicial shorthand for two conclusions: the first is that the imposition of secular standards on a church's employment of its ministers will burden the free exercise of religion; the second, that the state's interest in eliminating employment discrimination is outweighed by a church's constitutional right of autonomy in its own domain." *Equal Employment Opportunity Commission* v. *Catholic University of America*, 83 F.3d 455, 467 (D.C. Cir. 1996). We are mindful that the protections afforded by the first amendment apply to state as well as federal governmental actions. *Cantwell* v. *Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940) ("Fourteenth Amendment has rendered the legislatures of the states as incompetent

as Congress to enact . . . laws [that violate the first amendment's religion clauses]").

The ministerial exception's role in protecting important constitutional rights was first articulated in *McClure* v. *Salvation Army,* 460 F.2d 553 (5th Cir.), cert. denied, 409 U.S. 896, 93 S. Ct. 132, 34 L. Ed. 2d 153 (1972). In that case, the United States Court of Appeals for the Fifth Circuit concluded that the District Court did not have jurisdiction to decide a gender discrimination claim under Title VII. Id. The reason for the invocation of this ministerial exception was that "[a]n application of the provisions of Title VII to the employment relationship which exists between . . . a church and its minister, would involve an investigation and review of these practices and decisions and would, as a result, cause the [s]tate to intrude upon matters of church administration and government which have so many times before been proclaimed to be matters of a singular ecclesiastical concern. Control of strictly ecclesiastical matters could easily pass from the church to the [s]tate. The church would then be without the power to decide for itself, free from state interference, matters of church administration and government." Id., 560.

It bears emphasis that the ministerial exception is jurisdictional rather than evidentiary. Religious institutions need not rely on proof of affirmative defenses in employment discrimination suits but may categorically resist the judicial intrusion implicit in inquiry into their employment practices and relationships. *Equal Employment Opportunity Commission* v. *Catholic University of America,* supra, 83 F.3d 466, citing *National Labor Relations Board* v. *Catholic Bishop of Chicago,* 440 U.S. 490, 502, 99 S. Ct. 1313, 59 L. Ed. 2d 533 (1979); *Combs* v. *Central Texas Annual Conference of the United Methodist Church,* 173 F.3d 343, 350 (5th Cir. 1999) ("[i]n short, we cannot conceive how the

federal judiciary could determine whether an employment decision concerning a minister was based on legitimate or illegitimate grounds without inserting ourselves into a realm where the Constitution forbids us to tread, the internal management of a church").

We are persuaded that Connecticut administrative law, consistent with these persuasive precedents, must recognize the ministerial exception in the enforcement of our employment discrimination statutes.[3] The constitutional guarantee of the free exercise of religious authority requires secular institutions to defer to the decisions of religious institutions in their employment relations with their religious employees.[4] In broader terms, administrative and judicial intervention in religious employment relationships would violate the constitutional prohibition against civil entanglement in ecclesiastic disputes. Cf. *New York Annual Conference* v. *Fisher*, 182 Conn. 272, 278, 438 A.2d 62 (1980).

The ministerial exception prevents courts or government agencies from exercising jurisdiction over a religious institution's actions regarding the employment of

[3] We note that this court has upheld a trial court's determination that it lacked jurisdiction, on first amendment grounds, to delve into the workings of a church where one of its ministers was sued for negligent infliction of emotional distress. *DeCorso* v. *Watchtower Bible & Tract Society of New York, Inc.*, 78 Conn. App. 865, 880, 829 A.2d 38, cert. denied, 266 Conn. 931, 837 A.2d 805 (2003). This court concluded that "[u]nder both the free exercise clause and the establishment clause, the first amendment prohibits civil courts from resolving disputed issues of religious doctrine and practice." Id. Although we did not specifically adopt a ministerial exception for negligent infliction of emotional distress in *DeCorso*, our holding in that case did recognize that our courts are not well suited to resolve disputes involving religious doctrine.

[4] It bears mention that our General Statutes recognize that religious institutions, as incorporated entities, are governed by their own internal doctrine and laws. See generally General Statutes §§ 33-265 through 281a. In particular, corporations formed under the Roman Catholic Church "shall at all times be subject to the general laws and discipline of the Roman Catholic Church . . ." General Statutes § 33-281.

its ministers. In concluding that the commission properly relied on the ministerial exception in not exercising subject matter jurisdiction, we limit the exception's scope to the narrow scope recognized by the commission, namely, that the exception applies only to the employment of ministers and clergy broadly defined.[5]

II

The plaintiff's alternate claim is that, to the extent that federal case law has established a ministerial exception, that case law should not be given persuasive effect because the exception has been set aside by Congress through its enactment of the Religious Freedom Reformation Act of 1993, 42 U.S.C. § 2000bb et seq.[6] In particular, the plaintiff urges us to follow the

---

[5] There is no dispute in this case that the plaintiff was a ministerial employee as he had been ordained a Roman Catholic priest in April, 1992, and has served continuously in the diocese of Norwich.

The issue of whether the ministerial exception may be applied to nonministerial staff of a religious institution is not before us in this case. We note, however, that Connecticut has not applied the exception to such situations in the past. See *Commission on Human Rights & Opportunities* v. *Archdiocesan School Office*, 202 Conn. 601, 608, 522 A.2d 781 (reversing judgment of dismissal where commission had served interrogatories on archdiocesan school office during investigation of religious discrimination), appeal dismissed, 484 U.S. 805, 108 S. Ct. 51, 98 L. Ed. 2d 15 (1987).

[6] The substantive portion of the Religious Freedom Reformation Act at issue in *Hankins* v. *Lyght*, supra, 441 F.3d 99, 42 U.S.C. § 2000bb-1, provides: "(a) In general. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

"(b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

"(1) is in furtherance of a compelling governmental interest; and

"(2) is the least restrictive means of furthering that compelling governmental interest.

"(c) Judicial relief. A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution."

decision of the United States Court of Appeals for the Second Circuit in *Hankins* v. *Lyght*, supra, 441 F.3d 99. In that case, a divided court held that Congress impliedly had amended the antidiscrimination statutes, such as the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., to make them enforceable without regard to the free exercise clause of the first amendment. In asking us to follow the Second Circuit, the plaintiff asks us to apply the reasoning of *Hankins* to a Connecticut statute, General Statutes § 52-571b.[7] The plaintiff claims that this statute has the same effect as the Religious Freedom Reformation Act and that we should find that § 52-571b similarly precludes the application of the ministerial exception. We disagree.

[7] General Statutes § 52-571b provides: "Action or defense authorized when state or political subdivision burdens a person's exercise of religion. (a) The state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the Constitution of the state even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

"(b) The state or any political subdivision of the state may burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest.

"(c) A person whose exercise of religion has been burdened in violation of the provisions of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the state or any political subdivision of the state.

"(d) Nothing in this section shall be construed to authorize the state or any political subdivision of the state to burden any religious belief.

"(e) Nothing in this section shall be construed to affect, interpret or in any way address that portion of article seventh of the Constitution of the state that prohibits any law giving a preference to any religious society or denomination in the state. The granting of government funding, benefits or exemptions, to the extent permissible under the Constitution of the state, shall not constitute a violation of this section. As used in this subsection, the term 'granting' does not include the denial of government funding, benefits or exemptions.

"(f) For the purposes of this section, 'state or any political subdivision of the state' includes any agency, board, commission, department, officer or employee of the state or any political subdivision of the state, and 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion."

The plaintiff's argument for the direct applicability of *Hankins* is flawed for two reasons. First, the decisions of the Second Circuit, while often persuasive, do not bind the decisions of Connecticut courts. See *Turner* v. *Frowein*, 253 Conn. 312, 341, 752 A.2d 955 (2000). Second, the federal statute on which the court of appeals relied, the Religious Freedom Reformation Act, is unconstitutional as applied to state law. *Boerne* v. *Flores*, 521 U.S. 507, 536, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997).

The plaintiff's argument devolves, therefore, into the proposition that we should look to *Hankins* as persuasive guidance for the interpretation of § 52-571b because, in his view, our statute is analogous to the federal Religious Freedom Reformation Act. The court of appeals read the federal statute as evidencing Congress' intent that antidiscrimination statutes should be enforced, even against religious institutions. *Hankins* v. *Lyght*, supra, 441 F.3d 102. The question is whether § 52-571b manifests a similar intent.

We might simply dismiss the plaintiff's statutory argument because he has failed to support it by adequate briefing. See *Knapp* v. *Knapp*, 270 Conn. 815, 823 n.8, 856 A.2d 358 (2004) (Supreme Court "consistently [has] held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where the parties cite no law and provide no analysis of their claims, we do not review such claims." [Internal quotation marks omitted.]). In light of the importance of the plaintiff's argument, however, we have undertaken to ascertain its merits by examining its text and its legislative history. Our examination persuades us that the plaintiff's argument has no merit.

To decide whether § 52-571b has displaced the ministerial exception, we look to well established rules of

interpretation. "[Although] [o]rdinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes . . . when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law." (Internal quotation marks omitted.) *Board of Education* v. *State Board of Education*, 278 Conn. 326, 331, 898 A.2d 170 (2006). In the present case, § 52-571b has not been subject to judicial scrutiny in determining its application to our state's employment discrimination laws. Our review therefore is plenary.

Our interpretation of § 52-571b must begin by ascertaining whether the statute has a plain meaning. General Statutes § 1-2z;[8] see also *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 408, 891 A.2d 959 (2006). In our view, the language of § 52-571b, particularly with respect to its application to the ministerial exception, is not plain and unambiguous.

At first glance, the most directly relevant provisions of § 52-571b are subsections (a) and (b), which require courts to find a compelling state interest before a governmental actor, such as the commission, may substantially burden "a person's exercise of religion." Under the circumstances of this case, subsections (a) and (b) would seem to require the commission, in its adjudicative capacity, to apply the strict scrutiny test to any

---

[8] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

claim of infringement of the diocese's religious freedom rather than to apply the ministerial exception.

These subsections must, however, be read in conjunction with subsection (d), which provides that "[n]othing in this section shall be construed to authorize the state or any political subdivision of the state to burden any religious belief." General Statutes § 52-571b (d). The question becomes, therefore, whether secular interference with the employment of ministerial staff by a religious organization would constitute a "burden" on "religious belief." To answer this question, we must decide whether a religious institution's employment of ministerial staff is considered an "exercise of religion" under subsections (a) and (b) or a "religious belief" under subsection (d).

Because the text of § 52-571b does not provide an unambiguous answer to this question, it is useful to recall the historical events surrounding its passage. Beginning with *Sherbert* v. *Verner*, 374 U.S. 398, 406, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963), the United States Supreme Court required that governmental actions burdening the free exercise of religion be tested to determine whether they further a "compelling state interest." See also *Wisconsin* v. *Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972). *Sherbert* and its progeny apply the compelling state interest test because, in protecting religious freedom, "[i]t is basic that [the] showing merely of a rational relationship to some colorable state interest would [not] suffice; in this highly sensitive constitutional area, [o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation . . . ." (Citation omitted; internal quotation marks omitted.) *Sherbert* v. *Verner*, supra, 406–407.

After twenty-seven years in which the United States Supreme Court followed *Sherbert*, that court changed course in *Employment Division, Dept. of Human*

*Resources of Oregon* v. *Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L .Ed. 2d 876 (1990). *Smith* held that the free exercise rights of a member of the Native American Church did not prohibit the government from enforcing the generally applicable drug laws that criminalize the use of peyote, even if used in a of religious ceremony. Id., 885. In so holding, the court concluded that "the sounder approach, and the approach in accord with the vast majority of our precedents, is to hold the [compelling state interest] test inapplicable to such challenges. The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development. . . . To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is compelling—permitting him, by virtue of his beliefs, to become a law unto himself . . . contradicts both constitutional tradition and common sense." (Citations omitted; internal quotation marks omitted.) Id.

Although the legislative history of our statute is silent as to the precise meaning of either "exercise of religion" or "religious belief," the history does reveal that the overarching purpose of § 52-571b was to provide more protection for religious freedom under Connecticut law than the *Smith* decision would provide under federal law. As Representative Richard D. Tulisano stated when introducing the bill to the House of Representatives: "This bill enhances religious freedom and puts Connecticut once again in the forefront of supporting the variety of denominations that exist in the State and supporting that free exercise there." 36 H.R. Proc., Pt. 14, 1993 Sess., p. 4923. Members of the Senate echoed this sentiment: "[T]o be absolutely clear, this does not—this bill

does not expand, contract or alter the ability of a claimant to obtain relief in a manner consistent with the Supreme Court's free exercise jurisprudence under the compelling interest test prior to the *Smith* case." 36 S. Proc., Pt. 8, 1993 Sess., p. 2785, remarks of Senator George C. Jepsen.

The legislature illustrated its intent to reverse the effects of the *Smith* case by considering a number of specific situations in which its application would lead to the decreased protection of religious freedoms. Of particular import for our decision in this case is the testimony of one proponent who pointed out that *Smith* would have the undesired consequence of making employment discrimination laws applicable to religious institutions.[9] Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1991 Sess., p. 801. Although this testimony was presented at a public hearing on a similar bill introduced two years prior to the passage of § 52-571b, this history demonstrates that the legislature was aware of the impact that *Smith* might have had on employment discrimination laws.

Our review of the legislative history leads us to conclude that the legislature was, in general, mindful of the impact that *Smith* might have had on employment discrimination laws, but that the legislature was, in particular, protecting individual religious practices

---

[9] The following colloquy took place at the March 22, 1991 public hearing:

"Michael Farris: . . . Connecticut has a law that says you can't discriminate in employment on the basis of gender, as it should.

"[Representative Richard D. Tulisano]: Right.

"Michael Farris: Application of [the *Smith* case] to the Catholic church. [The] Catholic church will not hire women priests, will not ordain women priests. Should the Catholic church be forced to ordain women priests? Well as a matter of constitutional law, they should not.

"Should the black Musl[i]m church be forced to ordain white people—no. The black Musl[i]m church should be allowed to have their view about the proper people that they're going to have as their ministers." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1991 Sess., pp. 800–801.

through the strict scrutiny test. In protecting the religious practices of individuals, the legislature made the distinction between the "exercise of religion," which it protected with the strict scrutiny test found in subsections (a) and (b) of § 52-571b, and "religious beliefs," which the legislature prevented from being burdened by subsection (d). When interpreting what the legislature meant by using this distinction, we are mindful that when the legislature enacts a statute, it is presumed to be aware of the status of the law relevant to the statute. See *St. George* v. *Gordon*, 264 Conn. 538, 553, 825 A.2d 90 (2003) ("legislature is presumed to have acted with knowledge of existing statutes" [internal quotation marks omitted]); *Considine* v. *Waterbury*, 279 Conn. 830, 844, 905 A.2d 70 (2006) ("legislature is presumed to be aware of prior judicial decisions involving common-law rules" [internal quotation marks omitted]).

In our interpretation of the meaning that the legislature intended to give to "religious belief" in subsection (d) of § 52-571b, we look to United States Supreme Court jurisprudence on the distinction between the protection of religious practices and religious beliefs. In particular, we note that the United States Supreme Court has recognized that the internal governance of a religious institution, including the employment of ministers and clergy, is a protected religious belief of the institution. See *Serbian Orthodox Diocese* v. *Milivojevech*, 426 U.S. 696, 713, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976); *Kedroff* v. *St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952); see also *Petruska* v. *Gannon University*, 462 F.3d 294, 306–307 (3d Cir. 2006) ("[L]ike an individual, a church in its collective capacity must be free to express religious *beliefs*, profess matters of faith, and communicate its religious message. Unlike an individual who can speak on her own behalf, however, the church as an institution must retain the corollary right to select its voice. A minister

is not merely an employee of the church; she is the embodiment of its message." [Emphasis added.]).

The United States Court of Appeals for the Eleventh Circuit has elaborated on the different protections provided for religious practice and religious belief under federal constitutional law: "The *Smith* decision focused on the first type of government infringement on the right of free exercise of religion—infringement on an individual's ability to observe the practices of his or her religion. The second type of government infringement— interference with a church's ability to select and manage its own clergy—was not at issue in *Smith*. The Court's concern in *Smith* was that if an individual's legal obligations were contingent upon religious beliefs, those beliefs would allow each individual to become a law unto himself. . . . The ministerial exception does not subvert this concern; it was not developed to provide protection to individuals who wish to observe a religious *practice* that contravenes a generally applicable law. Rather, the exception only continues a long-standing tradition that churches are to be free from government interference in matters of church governance and administration. . . . Also, because the ministerial exception is based on this tradition and not on strict scrutiny, the Court's rejection in *Smith* of the compelling interest test does not affect the continuing vitality of the ministerial exception." (Citations omitted; emphasis added; internal quotation marks omitted.) *Gellington* v. *Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1303–1304 (11th Cir. 2000). Indeed, "[a]ll circuits to have addressed the question have recognized the continuing vitality of the exception after the Supreme Court's decision in [*Smith*]. See [id., 1302–1304]; *Combs* v. *Central Tex. Annual Conference of the United Methodist Church,* [supra, 173 F.3d 347–50]; [*Equal Employment Opportunity Commission* v.

*Catholic University of America*, supra, 83 F.3d 461–63]." (Citation omitted.) *Equal Employment Opportunity Commission* v. *Roman Catholic Diocese of Raleigh, North Carolina*, 213 F.3d 795, 800 n.\* (4th Cir. 2000).

In light of the distinctions made between religious practice and religious belief in the federal courts, we conclude that the legislature intended to maintain this distinction with its use of the language in § 52-571b. By protecting "free exercise" with the strict scrutiny test of subsections (a) and (b), the legislature intended to provide greater protection to religious *practices*, such as the ritualistic use of peyote at issue in *Smith*. As noted, the legislative history is replete with examples of religious practices that the legislature intended to protect under § 52-571b's strict scrutiny test.[10]

If we interpreted the "exercise of religion" language used in subsections (a) and (b) to apply to all religious beliefs, including a religious institution's employment of ministers and clergy, we would render the language exempting religious beliefs from the application of the statute superfluous. We do not interpret the language of one part of a statute in a manner that would make another part of the statute superfluous. See *Semerzakis* v. *Commissioner of Social Services*, 274 Conn. 1, 18–19, 873 A.2d 911 (2005) ("[T]he legislature did not intend to enact meaningless provisions. . . . [S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." [Internal quotation marks omitted.]). If subsections (a)

---

[10] Such examples include the lighting of candles in church, the receiving of wine at holy communion, wearing a yarmulke in court; 36 H.R. Proc., supra, p. 4923, remarks of Representative Richard D. Tulisano; forcing the Amish to use reflectors on their horse drawn buggies, and performing autopsies where it was against the deceased's religion. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1993 Sess., p. 1232, remarks of Robert Leikind, director, Connecticut office of the Anti-Defamation League.

and (b) provided the only means of protecting religious freedom in Connecticut, then there would be no need for subsection (d)'s protection of "religious belief." Because we must give meaning to the language used by the legislature; see id.; we conclude that the employment of ministers and clergy by a religious institution is a "religious belief" under subsection (d).[11]

Because we are persuaded that the employment practices of religious institutions are a form of "religious belief" for purposes of subsection (d), we conclude that the language of that subsection prevents the application of the strict scrutiny test of subsections (a) and (b). Section 52-571b, therefore, does not displace the ministerial exception. Accordingly, the trial court properly affirmed the commission's application of the ministerial exception and its determination that it lacked jurisdiction.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[11] We note that there have been several Superior Court cases dealing with the applicability of § 52-571b to zoning laws. *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission,* Superior Court, judicial district of Danbury, Docket No. CV-03-0350572-S (November 18, 2005) (40 Conn. L. Rptr. 410); *First Church of Christ, Scientist* v. *Historic District Commission,* 46 Conn. Sup. 90, 738 A.2d 224 (1998), aff'd, 55 Conn. App. 59, 737 A.2d 989, cert. denied, 251 Conn. 923, 742 A.2d 358 (1999). Because of the factual difference between those cases and the present one, we do not address the issue of how the compelling state interest test should

be applied, nor do we find those cases helpful in interpreting the language of § 52-571b.