06-1041-cv
Rweyemamu v. Cote

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2006

(Argued: October 26, 2006          Decided: March 21, 2008)

Docket No. 06-1041-cv
--------------------------------------------------------x
JUSTINIAN RWEYEMAMU and BUGURUKA ORPHANS & COMMUNITY
ECONOMIC DEVELOPMENT, INC.,

          Plaintiffs-Appellants,

          -- v. --

MICHAEL COTE, Bishop of Diocese of Norwich, and
NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION,

          Defendants-Appellees.

--------------------------------------------------------x

B e f o r e :  CARDAMONE, WALKER, and STRAUB, Circuit Judges.

Appeal from a judgment of the United States District Court for the District of Connecticut (Warren W. Eginton, Judge) concluding that the "ministerial exception" to Title VII barred plaintiff's suit and granting defendants' motion to dismiss for lack of jurisdiction. We hold that Title VII is unconstitutional as applied in this case and that the ministerial exception bars plaintiff's claim.

AFFIRMED.

NORMAN A. PATTIS, Bethany,
Conn., for Plaintiffs-
Appellants.

-1-

MEREDITH G. DIETTE, Brown Jacobson P.C., Norwich, Conn., for Defendants-Appellees.

MICHAEL L. COSTELLO, Tobin & Dempf (Mark E. Chopko, Jeffrey Hunter Moon, United States Conference of Catholic Bishops, Wash., D.C., on the brief), Albany, N.Y., for Amici Curiae the Salvation Army National Corporation, the General Council on Finance and Administration of the United Methodist Church, the Church of Jesus Christ of Latter-Day Saints, the Lutheran Church-Missouri Synod, the International Church of the Foresquare Gospel, the General Conference of Seventh-Day Adventists, and the United States Conference of Catholic Bishops.

JOHN M. WALKER, JR., Circuit Judge:

Alleging that the Roman Catholic Diocese of Norwich, through its Bishop, misapplied canon law in denying him a requested promotion and, ultimately, in terminating him, Father Justinian Rweyemamu, an African-American Catholic priest, claims racial discrimination in a Title VII suit against the Bishop and the Diocese. After the district court dismissed the suit pursuant to the "ministerial exception," Father Justinian appealed. The question we must decide is whether, under the First Amendment, Title VII is unconstitutional as applied in this case. In reaching this constitutional question, we distinguish this case from our decision in Hankins v. Lyght, 441 F.3d 96, 99 (2d Cir.

2006), which held that a federal statute, the Religious Freedom Restoration Act (RFRA) of 1993, 42 U.S.C. §§ 2000bb, 2000bb-1 to -4, governed the merits of an age discrimination action against a church.

**BACKGROUND**

As this case comes to us after the denial of a motion to dismiss, we accept the facts as they are alleged in the complaint. Almonte v. City of Long Beach, 478 F.3d 100, 104 (2d Cir. 2007). Father Justinian is an ordained priest of the Roman Catholic Church and the founder of Bugurka Orphans and Community Economic Development, Inc. (BOCED), a nonprofit organization. Prior to his dismissal, Father Justinian served for five years as parochial vicar at St. Bernard's Church in Rockville, Connecticut.

In April 2004, Father Justinian applied to be parish administrator of St. Bernard's, but he was not selected; the Diocese selected a white man instead. Thereafter, Father Justinian sought other promotions but was equally unsuccessful.

Concerned that the Diocese, through its Bishop, Michael Cote, had discriminated against him on the basis of his race, Father Justinian complained to church officials, arguing that Bishop Cote had failed to follow canon law in staffing the vacancies. He also filed claims with the Equal Employment Opportunities Commission (EEOC) and the Connecticut Commission on

-3-

Human Rights and Opportunities (CHRO), the state analogue to the EEOC.

In December 2004, the CHRO dismissed Father Justinian's complaint for lack of jurisdiction based on a constitutionally grounded ministerial exception, a decision ultimately affirmed by the Connecticut Court of Appeals.  See Rweyemamu v. Comm'n on Human Rights & Opportunities, 911 A.2d 319 (Conn. App. Ct. 2006), appeal denied, 916 A.2d 51 (Conn. 2007), cert. denied, 128 S. Ct. 206 (2007).  One month after the CHRO dismissed Father Justinian's complaint, Bishop Cote terminated Father Justinian's employment.  Father Justinian again appealed to higher church authorities, but again without success.  The Congregatio Pro Clericis in Rome found that there was "just cause" for Father Justinian's removal for several reasons, including "complaints regarding his homilies, complaints regarding his interaction with parish staff, . . . and the necessity of giving a unified and positive witness to the people of the parish."  Prot. No. 20042458 (Sept. 6, 2005); see also id. (stating that "[t]estimony in this case indicates that Father [Justinian] Rweyemamu was not sufficiently devoted to ministry" because his work with "BOCED interfere[d] with [his] full-time parochial duties").

After the adverse ruling in Rome, Father Justinian filed suit in the United States District Court for the District of Connecticut, claiming that the Diocese and Bishop Cote had

violated Title VII, 42 U.S.C. §§ 2000e to 2000e-17, and alleging a variety of state-law causes of action, including intentional infliction of emotional distress, tortious interference with business relations, and defamation, the latter causes of action arising from Bishop Cote's public statements concerning Father Justinian's involvement with BOCED. Upon defendants' motion, the district court (Warren W. Egington, Judge) dismissed Father Justinian's complaint for lack of jurisdiction. The district court concluded that "[t]he Free Exercise Clause of the First Amendment, . . . [through] the 'ministerial exception,' preserves a religious institution's right to be free from governmental entanglement [with the] management of its internal affairs." Rweyemamu v. Cote, No. 3:05CV00969, 2006 WL 306654, at *3 (D. Conn. Feb. 8, 2006). Father Justinian now appeals that decision.

**ANALYSIS**

We review a district court's decision to grant a motion to dismiss de novo. Marsh v. Rosenbloom, 499 F.3d 165, 172 (2d Cir. 2007). On appeal, Father Justinian argues principally that a recent decision of this court, Hankins v. Lyght, 441 F.3d 96 (2d Cir. 2006), "eliminated" the ministerial exception in employment cases governed by federal law, such as Title VII. Hankins, Father Justinian maintains, requires us to vacate the district court's judgment. We disagree.

I. **Hankins v. Lyght and the Application of RFRA**

-5-

We reach the question of the ministerial exception and decide this case on constitutional grounds notwithstanding our decision in Hankins, in which a panel of this court decided a similar case on statutory grounds, by holding that RFRA applied as a defense to the plaintiff's discrimination claim. Cf. Lyng v. Nw. Indian Cemetary Protective Ass'n, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). The statutory argument is not available in this case because defendants knowingly and expressly waived a RFRA defense.

In Hankins, a clergy member who was forced to retire at the age of seventy brought suit against his church and bishop under the Age Discrimination in Employment Act (ADEA) of 1967, 29 U.S.C. §§ 621-634. The district court dismissed the claim under Federal Rule of Civil Procedure 12(b)(6) "based on a 'ministerial exception' to the ADEA -- a rule adopted by several circuits that civil rights laws cannot govern church employment relationships with ministers without violating the free exercise clause because they substantially burden religious freedom." Hankins, 441 F.3d at 100. On appeal, however, the Hankins court's resolution of the dispute rested not on ministerial exception grounds but on its determination that RFRA "govern[ed] the merits of the principal issue raised by the parties." Id. at 99. The court

vacated the dismissal of the complaint and remanded for the district court to decide whether applying the ADEA to the church's action would violate RFRA.  See id.

    RFRA was enacted as a response to the Supreme Court's watershed decision in Employment Division v. Smith, 494 U.S. 872 (1990).  In passing RFRA, Congress sought to effect "a substantive change in constitutional protections."  City of Boerne v. Flores, 521 U.S. 507, 532 (1997).  Congress intended to restore the legal standard that was applied before Smith, see H.R. Rep. No. 103-88, at 6-7 (1993); see also S. Rep. No. 103-111, at 8 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1897-98, specifically the "compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963), and Wisconsin v. Yoder, 406 U.S. 205 (1972)," 42 U.S.C. § 2000bb(b)(1).

    In Smith, the Court noted that its decisions "have consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."  494 U.S. at 879 (internal quotation marks omitted).  In doing so, the Court distinguished Sherbert and Yoder, confining the former to its facts, see id. at 884-85, while holding that the latter involved more than just the right to free exercise of religion, see id. at 881 (discussing "the

Free Exercise Clause in conjunction with other constitutional protections," such as the right of parents to direct the education of their children).

In response to Smith, RFRA provides, in pertinent part that:

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1(b); see also id. § 2000bb-1(a) (providing that RFRA applies "even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section"). A person whose religious practices are burdened in violation of RFRA "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief." Id. § 2000bb-1(c); see Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 424 (2006).

RFRA is unusual in that it amends the entire United States Code. See 42 U.S.C. § 2000bb-3(a) ("This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise . . . ."); see also Eugene Gressman, RFRA: A Comedy of Necessary and Proper Errors, 21 Cardozo L. Rev. 507, 526 (1999) (calling RFRA "an amendment to every federal law and regulation in the land"). At bottom, the import of RFRA is that, whatever other statutes may (or may not) say, "the Federal

-8-

Government may not, as a statutory matter, substantially burden a person's exercise of religion." O Centro Espirita, 546 U.S. at 424 (emphasis added);[1] cf. EEOC v. Catholic Univ. of Am., 83 F.3d 455, 470 (D.C. Cir. 1996)(noting that Congress has "at least the facial authority to determine against whom, and under what circumstances, Title VII and other federal laws will be enforced"). This aspect of RFRA was acknowledged by the Hankins court when it expressly held that RFRA amended the ADEA: "It is obvious to us that because Congress had the power [under the Commerce Clause] to enact the ADEA, it also had the power to amend that statute by passing the RFRA." 441 F.3d at 106.

In so holding, the Hankins court began its analysis by addressing whether the church and bishop had waived any reliance upon RFRA as a defense to the plaintiff's action. In that case, the defendants mentioned RFRA only in passing in their original appellate brief, arguing "that the ADEA was an unlawful burden on their religious activities and that Congress has enacted the RFRA, a statute that applied to all federal laws, 'for this very reason.'" Id. at 104. The court asked for further briefing on this "seemingly dispositive but otherwise unmentioned statute." Id. Defendants' supplemental brief, however, explicitly

---

[1] The Senate Report is explicit on this score; Congress passed RFRA because state and local legislative bodies could not "be relied upon to craft [satisfactory] exceptions from laws of general application." S. Rep. No. 103-111, at 8.

disclaimed any intention of raising a RFRA defense and asserted RFRA's inapplicability because "the case at bar is a matter relating to a private employment situation and does not involve actions by the government." Id. (internal quotation marks omitted).

The Hankins panel nevertheless held that the defendants had not waived a RFRA defense because they "argued in the district court and here -- and continue to argue -- that application of the ADEA to the relationship between their church and appellant substantially burdens their religion." Id. In short, they had argued the "substance" of a RFRA defense. See id. But see id. at 111 (Sotomayor, J., dissenting) (noting that invocation of First Amendment rights does not necessarily implicate RFRA). Refuting the defendants' argument that RFRA did not apply to their case in any event because it concerned a dispute between purely private parties and did not involve the government, the Hankins court held that RFRA applied because the federal statute at issue (the ADEA) was enforceable by a government agency (the EEOC); the government therefore could have been a party to the suit, and the court reasoned that the application of RFRA should not vary depending on whether the party actually bringing suit is a private party or the EEOC:

> The ADEA is enforceable by the EEOC as well as private plaintiffs, and the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party. An action brought by an

-10-

agency such as the EEOC is clearly one in which the RFRA may be asserted as a defense, and no policy of either the RFRA or the ADEA should tempt a court to render a different decision on the merits in a case such as the present one.

Id. at 103 (citation omitted).

Notwithstanding our own doubts about Hankins's determination that RFRA applies to actions between private parties when the offending federal statute is enforceable by a government agency,[2] there is no need for us to wrestle with RFRA's applicability because the defendants in this case, unlike in Hankins, have

---

[2]     First, we think the text of RFRA is plain, see Leocal v. Ashcroft, 543 U.S. 1, 8 (2004) ("Our analysis begins with the language of the statute."), in that it requires the government to demonstrate that application of a burden to a person is justified by a compelling governmental interest. See 42 U.S.C. § 2000bb-1(b) (stipulating that government may only burden a person's exercise of religion if "it demonstrates" that it is necessary (emphasis added)); Hankins, 441 F.3d at 114-15 (Sotomayor, J., dissenting) ("The statute defines 'demonstrate' as 'meet[ing] the burdens of going forward with the evidence and of persuasion.' 42 U.S.C. § 2000bb-2(3). Where, as here, the government is not a party, it cannot 'go[] forward' with any evidence."). Thus, we do not understand how it can apply to a suit between private parties, regardless of whether the government is capable of enforcing the statute at issue. See also 42 U.S.C. § 2000bb-1(c) (providing for "appropriate relief against a government" (emphasis added)); Tomic v. Catholic Diocese, 442 F.3d 1036, 1042 (7th Cir. 2006), cert. denied, 127 S. Ct. 190 (2006); Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1121 (9th Cir. 2000) (suggesting that RFRA should not apply to suits between private parties); Redhead v. Conference of Seventh-Day Adventists, 440 F. Supp. 2d 211, 218 (E.D.N.Y. 2006).
     Second, there are strong policy reasons not to apply RFRA to an action by a private party seeking relief against another private party. RFRA does not apply to state law. Boerne, 521 U.S. 507. Thus, disparate treatment of federal- and state-law claims is assured -- consideration of the former under RFRA and the latter under NLRB v. Catholic Bishop, 440 U.S. 490 (1979); cf. Hutchison v. Thomas, 789 F.2d 392 (6th Cir. 1986) (dismissing common law claims under ministerial exception).

-11-

waived a RFRA defense.

Under Hankins,

> [a] party may certainly waive or forfeit a RFRA defense by failing to argue that a law or action substantially burdens the party's religion. . . . Where a party fails to assert a substantial burden on religious exercise before a district court, therefore, the party may not raise that issue . . . for the first time on appeal.

441 F.3d at 104. Here, the defendants never once mentioned RFRA in their motion to dismiss before the district court, nor did they ever argue that Title VII substantially burdens their religion. Their arguments to the district court were premised entirely on the ministerial exception and the Free Exercise Clause's requirement that churches be free from government interference in matters of church governance and administration. On appeal, defendants' argument is again rooted in the First Amendment and the ministerial exception: "The First Amendment . . . protects employment decisions made by religious institutions regarding ministerial employees from governmental oversight, including judicial review." Appellees' Br. at 8; see also id. at 11-15.

Moreover, defendants' brief states that Hankins should not apply because "the Diocese has not raised a RFRA defense," and "[t]he provisions of RFRA . . . may be waived." Id. at 18. It goes on to affirmatively assert: "The defendants[] explicitly waive a RFRA defense in this matter." Id. at 23 n.7 (emphasis added). While the last section of their brief contains an

-12-

argument that Title VII imposes a substantial burden on their exercise of religion, see id. at 22-25, defendants were forced to make this argument because Hankins had come down after their district court proceedings.  Recognizing Hankins's holding that a RFRA defense might be considered notwithstanding an express waiver by the church, defendants plainly presented their RFRA-based argument to cover the possibility that this panel would decide to follow the Hankins panel's analysis: "However, and in light of the Hankins decision, should this Court find that the defendants[] implicitly raise [a RFRA] defense, the defendants include here the analysis of said defense."  Id. at 23 n.7; see also id. at 22 (presenting a RFRA analysis only "[s]hould the Hankins decision control this case").

Because the defendants explicitly waived any defense based on a violation of RFRA after they became aware of Hankins, we find that they executed an effective waiver of a known right. See Curtis Publ'g Co. v. Butts, 388 U.S. 130, 143 (1967) ("[A]n effective waiver must . . . be one of a 'known right or privilege.'" (citation omitted)); cf. id. at 145 ("We would not hold that Curtis waived a 'known right' before it was aware of the New York Times decision.").  We therefore analyze the case on the primary grounds argued by the parties -- the application of the ministerial exception -- and need not further address Hankins's treatment of RFRA, as that statute is not at issue

-13-

here._____

**II.  The Ministerial Exception**

   **A.    The Roots of the Ministerial Exception**

Since at least the turn of the century, courts have declined to "interfere[] with ecclesiastical hierarchies, church administration, and appointment of clergy."  Minker v. Balt. Annual Conference of the United Methodist Church, 894 F.2d 1354, 1357 (D.C. Cir. 1990) (internal quotation marks omitted);[3] see also Douglas Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev. 1373, 1403 (1981).  Why they have done so remains a matter of some debate.  See Caroline Mala Corbin, Above the Law? The Constitutionality of the Ministerial Exemption from Antidiscrimination Law, 75 Fordham L. Rev. 1965, 1977-81 (2007).  Some courts have stressed the right to church autonomy secured by the Free Exercise Clause.  See, e.g., Petruska v. Gannon Univ., 462 F.3d 294, 306 (3d Cir. 2006) ("The Free Exercise Clause protects not only the individual's right to believe and profess whatever religious doctrine one desires, but also a religious institution's right to decide matters of faith,

_____

[3]    This line of cases stretches back to Watson v. Jones, 80 U.S. 679, 727 (1871); see also Jones v. Wolf, 443 U.S. 595, 602 (1979); Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 708-10 (1976); Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 107-10 (1952); Gonzalez v. Roman Catholic Archbishop, 280 U.S. 1, 16 (1929).

-14-

doctrine, and church governance." (internal quotation marks and citation omitted)), cert. denied, 127 S. Ct. 2098 (2007); Combs v. Cent. Tex. Annual Conference of the United Methodist Church, 173 F.3d 343, 349 (5th Cir. 1999); Catholic Univ., 83 F.3d at 462.

Others have emphasized that taking sides in a religious dispute would lead an Article III court into excessive entanglement in violation of the Establishment Clause. See, e.g., Tomic, 442 F.3d at 1038 ("A suit to remove a priest on the ground that he is a heretic, or to reinstate a parishioner who has been excommunicated, . . . has never been justiciable in the federal courts."); Gellington v. Christian Methodist Episcopal Church, Inc., 203 F.3d 1299, 1304 (11th Cir. 2000); Scharon v. St. Luke's Episcopal Presbyterian Hosps., 929 F.2d 360, 363 (8th Cir. 1991); cf. Commack Self-Serv. Kosher Meats, Inc. v. Weiss, 294 F.3d 415, 427 (2d Cir. 2002).

Thus, the ministerial exception cannot be ascribed solely to judicial self-abnegation. Cf. Watson, 80 U.S. at 729 ("It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own."). It is also required by the Constitution. This must be so because the presumptively appropriate remedy in a Title VII action is reinstatement, see Brooks v. Travelers Ins. Co., 297

-15-

F.3d 167, 170 (2d Cir. 2002), but it would surely be unconstitutional under the First Amendment to order the Catholic Church to reinstate, for example, a priest whose employment the Church had terminated on account of his excommunication based on a violation of core Catholic doctrine.

Finally, some courts have explained that "[t]he right to choose ministers without government restriction underlies the well-being of religious communit[ies]." Rayburn v. Gen. Conference of Seventh-Day Adventists, 772 F.2d 1164, 1167-68 (4th Cir. 1985); cf. Boy Scouts of Am. v. Dale, 530 U.S. 640, 648 (2000); Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 341-42 (1987) (Brennan, J., concurring).

Wherever its doctrinal roots may lie, the "ministerial exception" is well entrenched; it has been applied by circuit courts across the country for the past thirty-five years. See, e.g., Hollins v. Methodist Healthcare, Inc., 474 F.3d 223 (6th Cir.), cert. denied, 128 S. Ct. 134 (2007); Petruska, 462 F.3d 294; Tomic, 442 F.3d 1036; Elvig v. Calvin Presbyterian Church, 375 F.3d 951 (9th Cir. 2004); Bryce v. Episcopal Church in the Diocese, 289 F.3d 648 (10th Cir. 2002); EEOC v. Roman Catholic Diocese, 213 F.3d 795 (4th Cir. 2000); Gellington, 203 F.3d 1299; Starkman v. Evans, 198 F.3d 173 (5th Cir. 1999); Catholic Univ., 83 F.3d 455; Scharon, 929 F.2d 360; Natal v. Christian &

-16-

Missionary Alliance, 878 F.2d 1575 (1st Cir. 1989).[4]

The Fifth Circuit was the first circuit court formally to announce a "ministerial exception."  See McClure v. Salvation Army, 460 F.2d 553 (5th Cir. 1972).  In McClure, the court reviewed a sex discrimination claim brought by Billie B. McClure, an employee and minister of the Salvation Army.  Noting that Title VII on its face appeared to apply to the Salvation Army, the court "consider[ed] . . . the constitutional issue," id. at 558, and all-but held Title VII unconstitutional as applied, id. at 560 ("An application of the provisions of Title VII . . . [would] cause the State to intrude upon matters of church administration and government which have so many times before been proclaimed to be matters of a singular ecclesiastical concern.").  Ultimately, the court simply stated that "Congress did not intend, through the non-specific wording of the

---

[4]     The circuits have, however, taken different approaches in their application of the ministerial exception.  Four circuits have treated the exception as an affirmative defense that can be raised on a motion to dismiss pursuant to Rule 12(b)(6).  See, e.g., Petruska, 462 F.3d at 302; Bryce, 289 F.3d at 654; Bollard v. Cal. Province of the Soc'y of Jesus, 196 F.3d 940, 951 (9th Cir. 1999); Natal, 878 F.2d at 1578.  Two circuits have construed the ministerial exception as jurisdictional in nature and an appropriate ground for a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).  See, e.g., Hollins, 474 F.3d at 225; Tomic, 442 F.3d at 1038.  And two circuits have treated the exception as a command to interpret Title VII not to apply to claims between a church and its ministers.  See, e.g., Gellington, 203 F.3d at 1302-04; McClure v. Salvation Army, 460 F.2d at 560 (5th Cir. 1972); cf. Hankins, 441 F.3d at 117-18 (Sotomayor, J., dissenting).

-17-

applicable provisions of Title VII, to regulate the employment relationship between church and minister." Id. at 560-61.[5]

It should be noted that the term "ministerial exception" is judicial shorthand, but like any trope, while evocative, it is imprecise. The ministerial exception protects more than just "ministers," see Tomic, 442 F.3d at 1040-41 (applying exception to organist/music director); Alicea-Hernandez v. Catholic Bishop, 320 F.3d 698, 704 (7th Cir. 2003) (press secretary); Roman Catholic Diocese, 213 F.3d at 803-04 (director of music ministries), and it is not confined to the Christian faith, see Shaliehsabou v. Hebrew Home of Greater Wash., Inc., 363 F.3d 299, 309-11 (4th Cir. 2004) (applying exception to staff of Jewish nursing home). Moreover, although its name might imply an absolute exception, it is not always a complete barrier to suit; for example, a case may proceed if it involves a limited inquiry that, "combined with the ability of the district court to control discovery, can prevent a wide-ranging intrusion into sensitive

_____

[5] Subsequent courts have vacillated, with some abjuring constitutional decision-making and relying solely upon the canon of constitutional avoidance, see, e.g., Hankins, 441 F.3d at 118 n.13 (Sotomayor, J., dissenting) ("I would apply Catholic Bishop's principles of statutory construction so as to avoid making definitive pronouncements on the constitutional question."), some deciding that particular anti-discrimination laws are unconstitutional as applied under certain circumstances, see, e.g., Gellington, 203 F.3d at 1304 ("[T]he Free Exercise and Establishment Clauses of the First Amendment prohibit a church from being sued under Title VII by its clergy."); Combs, 173 F.3d at 351, and some doing one while making a pretense of the other, see, e.g., Scharon, 929 F.2d at 361-63.

-18-

religious matters." Bollard v. Cal. Province of the Soc'y of Jesus, 196 F.3d 940, 950 (9th Cir. 1999).

**B.    The Ministerial Exception in the Second Circuit**

This court has had no prior occasion to confirm the existence of the ministerial exception, and rarely an opportunity to discuss its scope. In Catholic High School Ass'n of the Archdiocese v. Culvert, 753 F.2d 1161 (2d Cir. 1985), we considered the legitimacy of an inquiry by the New York State Labor Relations Board into the allegedly anti-union practices of certain parochial schools with respect to their lay employees. We permitted the State Board to proceed after concluding that all it could do was "order an employer who refuses to bargain in good faith to return and bargain on the mandatory bargaining subjects, all of which are secular." Id. at 1167. We explained, however, that "the First Amendment prohibits . . . [the courts] from inquiring into an asserted religious motive to determine whether it is pretextual." Id. at 1168. And we expressly noted that the "Board . . . may order reinstatement of a lay teacher at a parochial school only if he or she would not have been fired otherwise for asserted religious reasons." Id. at 1169.

In DeMarco v. Holy Cross High School, 4 F.3d 166 (2d Cir. 1993), a Mormon high school asked us to pretermit the age discrimination claim of a lay teacher. We first confirmed that the ADEA was not broadly inapplicable to parochial schools. See

-19-

id. at 169-70.[6]  We next explained that while "[t]here may be cases involving lay employees in which the relationship between employee and employer is so pervasively religious that it is impossible to engage in an age-discrimination inquiry without serious risk of offending the Establishment Clause[,] . . . [t]his [wa]s not such a case."  Id. at 172.  We reiterated our conclusion in Catholic High School that courts may pretermit any "plausibility inquiry [because such an inquiry] could give rise to constitutional problems where, as in the case at bar, a defendant proffers a religious purpose for a challenged employment action."  Id. at 171.

Thus, our limited precedent to date supports the following propositions: (1) Title VII and the ADEA are not inapplicable to religious organizations as a general matter; (2) we will permit lay employees -- but perhaps not religious employees -- to bring discrimination suits against their religious employers; and (3) even when we permit suits by lay employees, we will not subject to examination the genuineness of a proffered religious reason for an employment action.

Presented with this occasion to formally adopt the

---

[6]    We also noted that "the legislative history of Title VII makes clear that Congress formulated the limited exemptions for religious institutions to discrimination based on religion with the understanding that provisions relating to non-religious discrimination would apply to such institutions."  DeMarco, 4 F.3d at 173.

ministerial exception, we affirm the vitality of that doctrine in the Second Circuit.  In our view, the ministerial exception is constitutionally required by various doctrinal underpinnings of the First Amendment.

The Free Exercise Clause protects a "church's right to decide matters of governance and internal organization." Petruska, 462 F.3d at 307.  Some employees have only religious duties.  Others may be lay employees of a religious organization. See, e.g., Catholic High School, 753 F.2d 1161 (discussing lay teachers).  Still others may have both secular and religious duties.  Cf. Hollins, 474 F.3d at 225-26.  The more "pervasively religious" the relationship between an employee and his employer, the more salient the free exercise concern becomes.  Cf. Bruce N. Bagni, Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations, 79 Colum. L. Rev. 1514, 1539 (1979) (noting that "[t]he relationship between a church and its clergy and modes of worship and ritual surely fall within the spiritual epicenter," which "represents the purely spiritual life of a church").

Circuit courts applying the ministerial exception have consistently struggled to decide whether or not a particular employee is functionally a "minister."  See Petruska, 462 F.3d at 304 n.6 (collecting cases).  While we agree that courts should consider the "function" of an employee, rather than his title or

the fact of his ordination, see Elvig, 375 F.3d at 958 & n.3 (citing cases), we still find this approach too rigid as it fails to consider the nature of the dispute. As we noted in DeMarco, a lay employee's relationship to his employer may be "so pervasively religious" that judicial interference in the form of a discrimination inquiry could run afoul of the Constitution. See 4 F.3d at 172. At the same time, however high in the church hierarchy he may be, a plaintiff alleging particular wrongs by the church that are wholly non-religious in character is surely not forbidden his day in court. The minister struck on the head by a falling gargoyle as he is about to enter the church may have an actionable claim. Cf. Petruska, 462 F.3d at 310 (concluding that plaintiff's breach of contract claim, which did not infringe on employer's freedom to select ministers, survived motion to dismiss based on ministerial exception); Minker, 894 F.2d at 1359-61; Rayburn, 772 F.2d at 1171 ("Like any other person or organization, [churches] may be held liable for their torts and upon their valid contracts. Their employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions.").

And it is to the relevance of the type of claim asserted that we now briefly turn. The Establishment Clause forbids "excessive government entanglement with religion." Lemon v. Kurtzman, 403 U.S. 602, 613 (1971) (internal quotation marks and

citation omitted).  "Entanglement may be substantive -- where the government is placed in the position of deciding between competing religious views -- or procedural -- where the state and church are pitted against one another in a protracted legal battle."  Petruska, 462 F.3d at 311.  The salience of this concern depends upon the claim asserted by the plaintiff.  Cf. DeMarco, 4 F.3d at 169-70 (distinguishing between the "ongoing government supervision of all aspects of employment" required by the NLRA and the "limited inquiry" entailed by the ADEA); Bollard, 196 F.3d at 950; Geary v. Visitation of Blessed Virgin Mary Parish Sch., 7 F.3d 324, 328 (3d Cir. 1993).  For instance, as the First Circuit has noted, whatever their "emblemata," some claims may inexorably entangle us in doctrinal disputes.  Natal, 878 F.2d at 1577.  By contrast, if a plaintiff alleges, for instance, that his religious employer has deceived him within the meaning of a state's common law of fraud, his case is less likely to run afoul of the Establishment Clause.

Turning now to the particulars of Father Justinian's complaint, we consider the constitutionality of Title VII as applied to this case.

**C.   The Ministerial Exception and Father Justinian's Suit**

We need not attempt to delineate the boundaries of the ministerial exception here, as we find that Father Justinian's Title VII claim easily falls within them.  Father Justinian is an

-23-

ordained priest of the Roman Catholic Church; his duties are determined by Catholic doctrine and they are drawn into question in this case. Furthermore, in order to prevail on his Title VII claim, he must argue that the decision of the Congregatio Pro Clericis was not only erroneous, but also pretextual. Such an argument cannot be heard by us without impermissible entanglement with religious doctrine. Because Title VII is unconstitutional as applied in this case, Father Justinian's federal claim fails at its inception. Cf. Petruska, 462 F.3d at 305 n.8 (citing Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320 (2006)).

With respect to the federal discrimination claim in particular, this case is on all fours with Minker v. Baltimore Annual Conference of the United Methodist Church. In that case, a sixty-three-year-old Methodist minister alleged that he had been denied a pastorship on account of his age and in violation of the ADEA. See Minker, 894 F.2d at 1355. The D.C. Circuit noted that "[t]he 1984-88 version of the Book of Discipline provide[s] that appointments must take into account . . . 'the gifts and graces of a particular pastor.'" Id. at 1356. The court thereupon dismissed the suit, persuasively explaining that it could not "imagine an area of inquiry less suited to a temporal court for decision [than] evaluation of the 'gifts and graces' of a minister." Id. at 1357. So, too, how are we, as

-24-

Article III judges, to gainsay the Congregatio Pro Clericis' conclusion that Father Justinian is insufficiently devoted to ministry? How are we to assess the quality of his homilies?

Natal v. Christian & Missionary Alliance is equally instructive on this point. There, a clergyman and his wife filed suit against the Christian and Missionary Alliance (CMA) alleging that the CMA had discharged him without cause. See Natal, 878 F.2d at 1576. The First Circuit affirmed the dismissal of the suit, holding that "the inquiry which Natal would have us undertake into the circumstances of his discharge [would] plunge[] an inquisitor into a maelstrom of Church policy, administration, and governance." Id. at 1578.

Finally, Simpson v. Wells Lamont Corp., 494 F.2d 490 (5th Cir. 1974), also sheds light upon the justiciability of Father Justinian's Title VII claim. In that case, a reverend and his wife sued the North Mississippi Conference of the United Methodist Church alleging that the latter had dismissed him because of his views on race relations and because his wife happened to be an African-American. The court dismissed the suit, concluding that a church's selection of its pastor could not be reviewed by a civil court and that "appellate procedure within the church hierarchy was [plaintiff's] avenue for review." Id. at 494.

We therefore conclude, based on the facts of this case -- in

-25-

particular, the nature of Father Justinian's duties and the basis for his dismissal -- that the ministerial exception bars Father Justinian's Title VII claim.  In addition to his federal employment discrimination claim, Father Justinian also alleges state-law claims of intentional infliction of emotional distress, tortious interference with business relations, and defamation. Because the district court properly dismissed Father Justinian's federal discrimination claim pursuant to the ministerial exception, it had no reason to exercise supplemental jurisdiction over his state-law claims.  Accordingly, we affirm the district court's dismissal of Father Justinian's state-law claims.

**CONCLUSION**

The judgment of the district court is hereby AFFIRMED.