### DOROTHY KUBALA *v.* HARTFORD ROMAN CATHOLIC DIOCESAN CORPORATION ET AL.*

Superior Court, Judicial District of New Haven
File No. CV-10-6014903-S

* Affirmed. *Kubala* v. *Hartford Roman Catholic Diocesan Corp.*, 134 Conn App. 459, 38 A.3d 1252 (2012).

Memorandum filed May 20, 2011

*Proceedings*

*John A. Cirello*, for the plaintiff.

*Beverly S. Knapp*, *James A. Alissi* and *Timothy M. Gondek*, for the defendants.

ALEXANDER, J. The plaintiff, Dorothy Kubala, commenced this action against the defendants, Robert Rousseau, St. Augustine's Church, and Hartford Roman Catholic Diocesan Corporation (Hartford Diocese), on September 16, 2010. In her original complaint, dated September 9, 2010, the plaintiff alleges the following facts: the Hartford Diocese was a corporation organized and existing under the laws of the state of Connecticut which managed Catholic churches in Connecticut that provided, among other things, Catholic Charismatic Renewal services, including healing masses. St. Augustine's Church was a Catholic church located in North Branford, Connecticut. Commencing on or about January 9, 2009, and for some time prior, St. Augustine's Church held a healing service that was open to the general public, including the plaintiff. Robert Rousseau held himself out to the general public as a Roman Catholic priest. He served as a priest at St. Augustine's Church in the Hartford Diocese and was subject to their rules, regulations, bylaws and protocols as promulgated by its boards, departments and committees. The Hartford Diocese and its servants, agents, apparent agents and/ or employees had a contract, agreement and/or other understanding with Rousseau and St. Augustine's Church under which the latter and their servants,

agents, apparent agents and/or employees would adhere to and abide by the rules, regulations, standards and protocols as promulgated by the Hartford Diocese and its departments, sections and committees. Pursuant to this agreement, the Hartford Diocese was to accept Rousseau's and St. Augustine's Church's parishioners into the church's facilities.

On January 9, 2009, the plaintiff voluntarily attended a healing service at St. Augustine's Church, presided over by Rousseau, which was held for members of the general public. The plaintiff alleges that while she was under the care and supervision of Rousseau, St. Augustine's Church and their servants, agents, apparent agents and/or employees, she approached the altar, was prayed over, and "rested in the spirit,"[1] falling backward and hitting the floor with the back of her head. She suffered severe and painful injuries as a result.

The plaintiff alleges that her injuries were caused by the defendants' failure to exercise the degree of care and skill ordinarily and customarily used by priests and churches performing Catholic Charismatic Renewal healing services. Specifically, the plaintiff alleges that the defendants were negligent in that they: (a) failed to follow protocols, rules and procedures as outlined by the Hartford Diocese and St. Augustine's Church; (b) failed to have attendees seated or kneeling while

---

[1] The plaintiff describes "resting in the spirit" in her memorandum in opposition to the defendants' motion to dismiss: "[T]he priest, Father Rousseau, anoints and prays over each person by having each person come to the front of the church . . . the priest anoints the person's forehead and prays over them. . . . Often, people will fall back in a relaxed state as the priest prays over them. . . . This is sometimes called 'Resting in the Spirit.' . . . [T]here are always Catchers, men who stand behind the person being prayed over. . . . The Catcher catches the person before they hit the floor and places them gently on the floor until they wake up again." Although the plaintiff expected that a catcher would be placed behind her while she fell backward to ensure she would not fall onto the floor, she was not caught from behind.

being prayed over; (c) failed to provide a safe, soft surface for attendees, including the plaintiff, to fall to, if and when they fell or "rested in the spirit"; (d) failed to warn attendees, including the plaintiff, about the possibility of injury while "resting in the spirit"; (e) failed to promulgate and/or enforce rules, regulations, standards and protocols for attendees, such as the plaintiff; (f) failed to adequately train and supervise the "catchers" at the healing service; (g) failed to choose "catchers" who were physically and mentally fit to exercise their duty as "catchers"; (h) failed to choose an appropriate number of "catchers" for the healing service; and, (i) failed to utilize that degree of care and skill or diligence ordinarily exercised by charismatic priests and churches in the Catholic Charismatic Revival.

On December 16, 2010, the defendants filed a motion to dismiss the plaintiff's complaint, which was accompanied by a memorandum of law. On February 8, 2011, the plaintiff filed an objection to the motion to dismiss. On February 10, 2011, the defendants filed a reply brief to the plaintiff's objection. The court heard oral argument on this matter on February 14, 2011. Based upon the review of the facts and the applicable case law, the court grants the motion to dismiss.

## LEGAL ANALYSIS

"A motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court." (Internal quotation marks omitted.) *Bacon Construction Co.* v. *Dept. of Public Works*, 294 Conn. 695, 706, 987 A.2d 348 (2010). "When a trial court decides a jurisdictional question raised by a pretrial motion to dismiss on the basis of the complaint alone, it must consider the allegations of the complaint in their most favorable light. . . .

In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *Conboy* v. *State*, 292 Conn. 642, 651, 974 A.2d 669 (2009). "[I]t is well established that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *Novak* v. *Levin*, 287 Conn. 71, 79, 951 A.2d 514 (2008).

The defendants argue that the plaintiff's complaint should be dismissed for lack of subject matter jurisdiction, as the defendants' conduct in the performance of the healing prayer service where the plaintiff was injured is protected by the Free Exercise and Establishment Clauses of the First Amendment to the United States constitution, the comparable provisions in Articles One and Seven of the Connecticut constitution, and General Statutes § 52-571b. The plaintiff counters in her memorandum in opposition to the motion to dismiss that her claims are not barred by the First Amendment, the Connecticut constitution or by General Statutes § 52-571b.

I

The First Amendment to the United States constitution provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." In addition, Article First, § 3, of the constitution of Connecticut provides in relevant part: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state . . . ." The religious freedoms embraced in the First Amendment to the United States constitution apply to the States through the Fourteenth Amendment. See *Cantwell* v. *Connecticut*, 310 U.S. 296, 303–304, 60 S. Ct. 900,

84 L. Ed. 1213 (1940). "The values underlying these two provisions relating to religion have been zealously protected, sometimes even at the expense of other interests of admittedly high social importance." *Wisconsin* v. *Yoder*, 406 U.S. 205, 214, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972). "[T]he first amendment has been interpreted broadly to severely [circumscribe] the role that civil courts may play in resolving . . . disputes concerning issues of religious doctrine and practice. . . . Under both the free exercise clause and the establishment clause, the first amendment prohibits civil courts from resolving disputed issues of religious doctrine and practice. . . . By contrast, exercise of governmental authority is permissible if it (1) has a secular purpose, (2) neither inhibits nor advances religion as its primary effect and (3) does not create excessive entanglement between church and state. . . . Under excessive entanglement analysis, civil tort claims requiring courts to review and to interpret religious doctrine and practices are barred by the first amendment." (Citations omitted; internal quotation marks omitted.) *Thibodeau* v. *American Baptist Churches of Connecticut*, 120 Conn. App. 666, 671, 994 A.2d 212, cert. denied, 298 Conn. 901, 3 A.3d 74 (2010). Freedom of religion is guaranteed to individuals as well as churches, which have "power to decide for themselves, free from state interference, matters of . . . faith and doctrine." *Kedroff* v. *St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952).

## A

The defendants argue that the plaintiff's claims are barred by the Free Exercise and Establishment clauses of the First Amendment to the United States Constitution and by article first, § 3, of the constitution of Connecticut. Specifically, the defendants argue that the subject matter of the dispute is ecclesiastical in nature,

and that analysis of the plaintiff's claims would constitute impermissible State entanglement with religious issues. The plaintiff counters that her claims are not barred under either the First Amendment to the United States constitution or Article First, § 3, of the Connecticut constitution because the subject matter of the dispute is not ecclesiastical but is instead grounded in simple negligence. The plaintiff claims that the Free Exercise clause does not apply to the instant case because "[t]here is nothing in the allegations of the complaint nor [the] facts of the incident that could possibly contemplate the examination of worship or spirituality."

"The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment obviously excludes all 'governmental regulation of religious *beliefs* as such.' . . . The government may not compel affirmation of religious belief . . . punish the expression of religious doctrines it believes to be false . . . impose special disabilities on the basis of religious views or religious status . . . or lend its power to one or the other side in controversies over religious authority or dogma . . . ." (Citations omitted; emphasis in original.) *Employment Division, Dept. of Human Resources of Oregon* v. *Smith,* 494 U.S. 872, 877, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990). "Indeed, it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria." *Serbian Orthodox Diocese* v. *Milivojevich,* 426 U.S. 696, 714–15, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976). "When a defendant raises the free exercise clause of the first amendment as a defense, the threshold question is whether the conduct of the defendants is religious." *Mallory* v. *Hartford Roman Catholic Diocesan Corp.,* Superior Court, judicial district of Waterbury, Docket

No. X10-CV-07-5007646-S (February 24, 2009) (*Scholl, J.*).

The Connecticut Appellate Court has analyzed the scope of protection provided by the First Amendment to religious entities and officials in cases where the subject matter of the dispute is ecclesiastical in nature. In *DeCorso* v. *Watchtower Bible & Tract Society of New York, Inc.*, 78 Conn. App. 865, 829 A.2d 38, cert. denied, 266 Conn. 931, 837 A.2d 805 (2003), the plaintiff sued the defendants, elder members of the Jehovah's Witnesses, in part for negligent infliction of emotional distress. She alleged that she suffered constant abuse from her husband throughout her marriage and that the defendants, who provided her with marital and spiritual counseling, advised her to continue enduring the abuse. Id., 867. She further alleged that the defendants did not act in conformity with their religion's teachings. Id., 868.

The court granted the defendants' motion for summary judgment on the ground that any analysis of the plaintiff's claims would require impermissible inquiry into religious doctrine and practice. It emphasized that the plaintiff alleged she sought marital and spiritual counseling from the defendants, and that she received bad advice that was contrary to their religion's teachings. The court stated: "Determining whether the defendants' counseling created an unreasonable risk of emotional harm or that the plaintiff's distress was foreseeable would require a court to evaluate the proprieties of religious teachings. Furthermore, the plaintiff cites certain Jehovah's scriptures, which would require the court to evaluate whether the defendants counseled in accordance therewith." Id., 879–80.

Similarly, the present case clearly involves issues of religious doctrine and practice, and the court does not have jurisdiction to resolve this dispute. The plaintiff's allegations stem from an injury that she suffered while

voluntarily participating in a Catholic healing ritual service at St. Augustine's Church. She alleges that she was injured after she approached the altar, was prayed over, and "rested in the spirit," causing her to fall backward and hit the floor with the back of her head. These claims are based on the defendants' allegedly negligent performance of the healing ritual. The performance of a religious healing ritual certainly falls under the types of doctrines and practices which the first amendment is designed to protect. See *New York Annual Conference* v. *Fisher*, 182 Conn. 272, 281, 438 A.2d 62 (1980) (describing "ritual and liturgy of worship or the tenets of faith" as examples of doctrinal matters).

The plaintiff argues that First Amendment protections do not apply because the defendants' allegedly tortious conduct was not religious in nature. She claims that her allegations deal merely with simple negligence and that "[t]here is nothing in the allegations of the complaint nor facts of the incident that could possibly contemplate the examination of worship or spirituality." This argument, however, fails to acknowledge that the incident giving rise to the plaintiff's complaint occurred during a religious healing ritual. It would be improper to completely remove the incident from the religious context in which it occurred. Thus, despite the plaintiff's argument that the defendants' alleged omissions during the healing ritual are not religious in nature, the subject matter of the complaint clearly involves issues of spirituality and religious worship.

The plaintiff, nonetheless, cites to several Connecticut trial court cases for the proposition that civil courts may inquire into issues of religious doctrine and practice. Several of these cases, all involving allegations that members of the clergy sexually abused minors, relied on *Nutt* v. *Norwich Roman Catholic Diocese*, 921 F. Sup. 66 (D. Conn. 1995), a federal District Court case applying Connecticut law. In *Nutt*, the plaintiffs brought

a negligent employment action against a Catholic church, the diocese and an order of priests, alleging that they were sexually abused by a priest when they were minors. The defendants filed a motion for summary judgment, asserting that the Free Exercise clause prohibited the court from determining the plaintiffs' claims. The court disagreed, holding that the defendants were not protected from liability under the Free Exercise clause because the plaintiffs' claims were not rooted in religious belief: "[T]he Court has held that the First Amendment does not create blanket tort immunity for religious institutions or their clergy, thus allowing clergy and clerical institutions to be sued for the torts they commit. . . . The court's determination of an action against the defendants based upon their alleged negligent supervision of [a priest] would not prejudice or impose upon any of the religious tenets or practices of Catholicism. Rather, such a determination would involve an examination of the defendants' possible role in allowing one of its employees to engage in conduct which they, as employers, as well as society in general expressly prohibit. Since the Supreme Court has consistently failed to allow the Free Exercise Clause to 'relieve [an] individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs,' the defendants [cannot] appropriately implicate the First Amendment as a defense to their alleged negligent conduct." (Citations omitted.) Id., 73–74.

In support of her argument, the plaintiff references *Noll* v. *Hartford Roman Catholic Diocesan Corp.*, Superior Court, judicial district of Hartford, Docket No. X04-CV-02-4034702-S (October 20, 2008) (*Shapiro, J.*) (46 Conn. L. Rptr. 527). There, on facts similar to *Nutt* v. *Norwich Roman Catholic Diocese*, supra, 921 F. Sup. 66, the court held: "[T]he bulk of the plaintiff's claims have nothing to do with scripture or religious teachings.

These allegations concern child sex abuse by a Catholic priest, and whether the Diocesan Corporation knew or should have known of the same, *about which there would be no need for the court to evaluate the proprieties of scripture or religious teachings.*" (Emphasis added.) [*Noll* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 46 Conn. L. Rptr. 529]. On similar facts, the court in *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, [45 Conn. Sup. 397, 401, 716 A.2d 967 (1998)], stated: "[T]here is no indication that, by taking the kind of preventative action required by tort law, the [institutional] defendants would have violated any doctrine practice or law of the Roman Catholic Church. *In the absence of such a conflict*, subjecting the [institutional] defendants to potential tort liability does not violate their right to the free exercise of their religion." (Emphasis added; internal quotation marks omitted.)

The facts of *Nutt* v. *Norwich Roman Catholic Diocese*, supra, 921 F. Sup. 66, and other similar Connecticut cases cited to by the plaintiff, however, are inapposite to the present case. In those cases, the plaintiffs' claims stem from allegations of intentional tortious conduct—the sexual abuse of minors by members of the clergy—which have no connection whatsoever to religious doctrine or practice. *Noll* v. *Hartford Roman Catholic Diocesan Corp.*, supra, Superior Court, Docket No. X04-CV-02-4034702-S ("there is no doubt that the Catholic Church views the sexual abuse of children as wrongful"). There, the plaintiffs' causes of action could proceed because analysis of such claims would not require impermissible delving into issues of worship and spirituality. In contrast, in the present case, the plaintiff alleges that the defendants were negligent in failing to establish adequate safety precautions for voluntary participants during a Catholic Charismatic healing ritual service taking place at St. Augustine's Church.

The facts of the clergy sex abuse cases are distinct from the present case, where the conduct complained of is clearly ecclesiastical in nature.

## B

The defendants argue that the court cannot evaluate the plaintiff's claims because the present dispute cannot be determined on the basis of neutral principles of secular law. The plaintiff counters that her personal injuries were caused by the defendants' negligence and that neutral principles of law may be applied.

"[N]ot every civil court decision . . . jeopardizes values protected by the [f]irst [a]mendment." (Internal quotation marks omitted.) *Thibodeau* v. *American Baptist Churches of Connecticut*, supra, 120 Conn. App. 673. "If a court can resolve the dispute by applying only neutral principles of law, however, judicial review may be permissible." Id. "[S]tate judicial intervention is justified when it can be accomplished by resort to neutral principles of law . . . that eschew consideration of doctrinal matters such as the ritual and liturgy of worship or the tenets of faith." *New York Annual Conference* v. *Fisher*, supra, 182 Conn. 281. "The central question . . . is whether the disputes require the court to interpret and to apply religious doctrine and practices or whether the dispute is simply a controversy that involves church officials but to which neutral principles of secular law can be applied without need to inquire into ecclesiastical matters." *Thibodeau* v. *American Baptist Churches of Connecticut*, supra, 675; see, e.g., *Jones* v. *Wolf*, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979) (applying ordinary principles of property law in case involving church officials without delving into ecclesiastical matters).

In *Hayes* v. *Norwich Roman Catholic Diocesan Corp.*, Superior Court, judicial district of Middlesex, Docket No. CV-02-0100267 (March 5, 2004) (*Silbert, J.*)

(36 Conn. L. Rptr. 676), the court stated: "The claim of negligent hiring, retention and supervision is brought only after an employee, in this case a priest, has harmed a third party. This involves a factual inquiry and requires no interpretation or weighing of a religious belief but is merely the application of a secular standard, regardless of what aspect of tortious misconduct is before the court." See *Nutt* v. *Norwich Roman Catholic Diocese*, supra, 921 F. Sup. 74 ("[t]he common law doctrine of negligence does not intrude upon the free exercise of religion"). *Hayes* and the other cases cited by the plaintiff, all involving allegations of sexual abuse of minors by clergy members, are distinguishable from the present case in that they all involve intentional tortious conduct. There, neutral principles of secular law are clearly applicable as such acts have no connection to religious doctrine and practice.

By contrast, the plaintiff alleges that the defendants were negligent in failing to ensure adequate safety precautions for voluntary participants in a religious healing ritual. Here, it would be impossible for the court to apply neutral principles of secular law to evaluate the plaintiff's claims because of the religious context in which the incident occurred. The court cannot evaluate this issue without impermissibly inquiring into religious matters. Accordingly, since the plaintiff's claims are inextricably intertwined with the religious context in which the incident occurred, the court cannot apply neutral principles of secular law to this case.

C

The defendants claim that there are no substantial State interests that outweigh the First Amendment protections provided to defendants conducting a religious healing ritual. The plaintiff maintains that she need not show a substantial State interest because adjudication

of her claims would not involve impermissible entanglement with ecclesiastical issues.

Despite the plaintiff's assertions to the contrary, the subject matter of her causes of action are ecclesiastical in nature. The plaintiff cites to *Employment Division, Dept. of Human Resources of Oregon* v. *Smith*, supra, 494 U.S. 877, for the proposition that "a generally applicable state law does not have to meet the substantial state interest test." As mentioned above, however, the plaintiff cannot rely on neutral principles of secular law to resolve the dispute, as her claims cannot be taken out of the religious context in which the incident occurred. Therefore, her claims can only be evaluated if substantial State interests outweigh the defendants' First Amendment rights.

"[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin* v. *Yoder*, supra, 406 U.S. 215. The Connecticut Appellate Court, in *Thibodeau* v. *American Baptist Churches of Connecticut*, supra, 120 Conn. App. 682, citing *Heard* v. *Johnson*, 810 A.2d 871, 883 (D.C. 2002), stated: "The *Heard* court allowed that not all church activities are protected from judicial inquiry: where 'important state interests' are at stake, a 'delicate balancing' is required." "Most civil rights and common-law claims are not sufficient to overcome first amendment protection." [*Thibodeau* v. *American Baptist Churches of Connecticut*, supra, 682.]

Because the interests would need to be "of the highest order" for it to outweigh First Amendment protections, most common-law claims simply cannot do so. See *Heard* v. *Johnson*, supra, 810 A.2d 883 ("[u]nder most circumstances, defamation is one of those common law claims that is not compelling enough to overcome [f]irst [a]mendment protection surrounding a church's choice

of pastoral leader"); *Minker* v. *Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1355 (D.C. Cir. 1990) (dismissing pastor's age discrimination claim on ground that it does not overcome first amendment protection); *Simpson* v. *Wells Lamont Corp.*, 494 F.2d 490, 494 (5th Cir. 1974) (dismissing minister's wrongful discharge cause of action as not compelling enough to overcome first amendment protection).

In the present case, the plaintiff's claims are not of the "highest order" such that it can outweigh the defendants' First Amendment protections.[2] Rather, the claims are more similar to defamation, wrongful discharge, age discrimination and other causes of action which the courts have determined are not strong enough to overcome First Amendment protections. As there is no showing that the plaintiff's claims involve substantial State interests that outweigh the defendants' First Amendment protections, her claims cannot proceed.

## II

The defendants argue that the plaintiff's causes of action involve clergy malpractice, which would require the court to engage in an impermissible inquiry into religious doctrine and practice. The plaintiff counters that her claims sound in simple negligence and not clergy malpractice, and that such claims may be analyzed using a reasonable person standard.

## A

In support of their argument that the plaintiff's allegations involve clergy malpractice, the defendants point to the language of the plaintiff's complaint. There, the

---

[2] The cases concerning allegations of sexual abuse by clergy members involved a substantial State interest that outweighed First Amendment protections. Those cases are distinct from the present case, however, in that the State certainly has a substantial interest in punishing sexual abuse of minors by clergy members.

plaintiff alleges that Rousseau "[failed] to exercise that degree of care and skill ordinarily and customarily used by *priests* performing Catholic Charismatic Renewal healing services under all of the facts and circumstances . . . ." (Emphasis added.) She also alleges that St. Augustine's Church "[failed] to exercise that degree of care and skill ordinarily and customarily used by *churches* performing Catholic Charismatic Renewal healing services under all of the facts and circumstances . . . ." (Emphasis added.) The plaintiff counters that General Statutes § 52-123 requires that the court read these allegations in the context of the entire complaint, which she claims will show that the central issue in this case is simple negligence and not clergy malpractice.

General Statutes § 52-123 provides: "No writ, pleading, judgment or any kind of proceeding in court or course of justice shall be abated, suspended, set aside or reversed for any kind of circumstantial errors, mistakes or defects, if the person and the cause may be rightly understood and intended by the court." "The purpose of § 52-123 is to afford relief from defects found in the text of the writ itself. . . . It is not the policy of our courts to interpret rules and statutes in so strict a manner as to deny a litigant the pursuit of its complaint for mere circumstantial defects. . . . Indeed, § 52-123 . . . protects against just such consequences, by providing that no proceeding shall be abated for circumstantial errors so long as there is sufficient notice to the parties." (Citation omitted; internal quotation marks omitted.) *Rocco* v. *Garrison*, 268 Conn. 541, 557–58, 848 A.2d 352 (2004). "Our Supreme Court in *Andover Ltd. Partnership I* v. *Board of Tax Review*, [232 Conn. 392, 397, 655 A.2d 759 (1995)], reiterated the test for determining whether a defect is circumstantial under § 52-123. First, the court looked to whether the party intended to reference the proper party or whether it 'had erroneously misdirected its action.' . . . 'Second,

[the court] considered three factors to determine whether the error was a misnomer and therefore a circumstantial defect under § 52-123: (1) whether the proper defendant had actual notice of the institution of the action; (2) whether the proper defendant knew or should have known that [he] was the intended defendant in the action; and (3) whether the proper defendant was in any way misled to [his] prejudice.' " *State* v. *Gillespie*, 92 Conn. App. 143, 150, 884 A.2d 419 (2005).

"Defective pleadings are broken down into two categories: circumstantial defects, which are subject to correction under § 52-123, and substantive defects, which are not. . . . 'Circumstantial defects not subject to abatement by reason of § 52-123 or its predecessors have included the mistaken use of a Practice Book form . . . failure to designate an apartment number in a writ . . . an erroneous reference in appeal papers to next term instead of next return day . . . a copy of the affidavit attached to the writ served upon the defendant that did not bear the signature of the affiant . . . an erroneous reference in the return to the City Court held at New Haven in and for the city of New Haven instead of The City Court of New Haven . . . an erroneous prayer for relief on the writ and declaration rather than on the writ alone . . . and a defendant who had signed his name in the body of a plea in abatement signed defendant at the end of the plea instead of again signing his name.' " (Citation omitted.) [Id., 149–50.]

In her memorandum in opposition to the motion to dismiss, the plaintiff admits that her complaint alleges Rousseau and St. Augustine's Church failed to exercise the degree of care ordinarily used by "priests" and "churches." She argues, however, that § 52-123 "requires the Court to look at the substance of [the] plaintiff's complaint rather than a hypertechnical analysis of the form," and that her claims sound in simple negligence and not clergy malpractice. The plaintiff's

construal of the scope of § 52-123 is impermissibly broad. Section 52-123 allows the court to correct circumstantial defects such as misnomers and misdescriptions, which are not at issue in this case, where the plaintiff simply alleges that Rousseau and St. Augustine's Church failed to exercise the degree of care ordinarily used by "priests" and "churches." The plaintiff did not erroneously misdirect its action or use a misnomer in her complaint. Accordingly, the plaintiff cannot rely on § 52-123 to support her argument that her claims sound in simple negligence rather than clergy malpractice.

## B

"Malpractice is commonly defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services . . . ." (Internal quotation marks omitted.) *Ackerly & Brown, LLP* v. *Smithies*, 109 Conn. App. 584, 586 n.2, 952 A.2d 110 (2008). " '[C]ourts throughout the United States have uniformly rejected claims for clergy malpractice under the First Amendment' because such claims would 'necessarily entangle the court in the examination of religious doctrine, practice, or church polity—an inquiry that . . . is prohibited by the Establishment Clause.' " *DeCorso* v. *Watchtower Bible & Tract Society of New York, Inc.*, supra, 78 Conn. App. 879, citing *Franco* v. *Church of Jesus Christ of Latter-day Saints*, 21 P.3d 198, 204 (Utah 2001).

According to the plaintiff, Rousseau "[failed] to exercise that degree of care and skill ordinarily and customarily used by *priests* performing Catholic Charismatic Renewal healing services under all of the facts and circumstances . . . ." (Emphasis added.) She alleges

that St. Augustine's Church "[failed] to exercise that degree of care and skill ordinarily and customarily used by *churches* performing Catholic Charismatic Renewal healing services under all of the facts and circumstances . . . ." (Emphasis added.) She further alleges, inter alia, that all three defendants "failed to promulgate and/or enforce rules, regulations, standards and protocols for attendees such as the plaintiff"; "failed to have attendees seated or kneeling" while being prayed over; "failed to adequately train and supervise the 'catchers' at the healing service"; and "failed to exercise that degree of care and skill or diligence ordinarily had by charismatic priests in the Catholic Charismatic Revival."

The plaintiff alleges that the defendants failed to carry out their duties to exercise the appropriate degree of care by charismatic priests and churches during the ritual. She argues that "[i]t is clear that [the defendants] foresaw a duty to protect people" from injuring themselves by having people stand behind healing ritual participants to catch them. In addition, she states that the church could have taken other precautions to ensure the safety of healing ritual participants, such as placing a soft object behind a participant to break their fall, providing warnings to participants about the potential dangers of "resting in the spirit," and ensuring that "catchers" were adequately supervised and trained to carry out their duties.

For a court of law to determine the plaintiff's claims, it would be required to ascertain whether the defendants performed within that level of skill commonly applied under the given circumstances by the average prudent clergy member. Such analysis, however, would necessarily involve evaluating the religious practices at issue. To evaluate the plaintiff's claims, the court would need to define the appropriate standard of care and determine whether the clergy acted in accordance with that standard of care. Devising guidelines and protocols

for clergy members presiding over religious services, however, would entangle the court with issues of religious doctrine and practice, which is exactly the type of conduct prohibited by the First Amendment. In support of the proposition that her claim does not sound in clergy malpractice, the plaintiff states that the Hartford diocese website states that the individuals who pray over the participants at a religious healing ritual are not necessarily priests. She attaches to her memorandum in opposition to the motion to dismiss the affidavit of a lay member of the church, who stated that he used to lead the largest Catholic Charismatic Renewal prayer group in Connecticut and that when he was leading the group, he "would pray over people and some of them would 'rest in the spirit.' " The facts provided in this affidavit are of no moment, as the present plaintiff's claims stem from a priest's alleged negligence while presiding over a religious healing ritual at a Catholic church, not from the negligence of a layperson leading a prayer group. Accordingly, the plaintiff's allegations are rooted in clergy malpractice, and adjudication of her claims is prohibited by the First Amendment.

### III

The defendants argue that General Statutes § 52-571b provides even greater protection for religious healing masses than allowed under federal law.[3] The plaintiff

---

[3] General Statutes § 52-571b provides in relevant part: "(a) The state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the Constitution of the state even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

"(b) The state or any political subdivision of the state may burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest.

"(c) A person whose exercise of religion has been burdened in violation of the provisions of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the state or any political subdivision of the state.

counters that § 52-571b does not apply because Article 1, § 3, of the Connecticut Constitution contains a public safety exception.

The Appellate Court discussed the legislative history surrounding the enactment of § 52-571b in *Rweyemamu* v. *Commission on Human Rights & Opportunities*, 98 Conn. App. 646, 911 A.2d 319 (2006), [cert. denied, 281 Conn. 911, 916 A.2d 51, cert. denied, 552 U.S. 886, 128 S. Ct. 206, 169 L. Ed. 2d 144 (2007)]. There, the *Rweyemamu* court acknowledged that § 52-571b was enacted largely in response to the United States Supreme Court's decision in *Employment Division, Dept. of Human Resources of Oregon* v. *Smith*, supra, 494 U.S. 872, which held that the government does not have to apply the strict scrutiny test in determining whether the State can burden the Free Exercise of religion. The *Smith* court stated that the government could criminalize the use of the drug peyote through the enforcement of neutral principles of secular law, even if the drug was used in a religious ceremony. "[T]he sounder approach . . . is to hold the [compelling state interest] test inapplicable to such challenges. The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development." (Internal quotation marks omitted.) Id., 885.

The Connecticut Appellate Court, in *Rweyemamu*, emphasized that the State legislature enacted § 52-571b for the "overarching purpose" of "provid[ing] more protection for religious freedom under Connecticut law than the *Smith* decision would provide under federal

"(d) Nothing in this section shall be construed to authorize the state or any political subdivision of the state to burden any religious belief. . . ."

law." [*Rweyemamu* v. *Commission on Human Rights & Opportunities*, supra, 98 Conn. App. 660]. "[T]he legislature was, in general, mindful of the impact that *Smith* might have had on employment discrimination laws, but . . . the legislature was, in particular, protecting individual religious practices through the strict scrutiny test." (Emphasis added.) Id., 661–62. The court then discussed the distinction in § 52-571b between "religious exercise" and "religious belief" in order to determine which § 52-571b standard applied to a minister's employment discrimination complaint against his employer, the diocese. Pursuant to § 52-571b (a) and (b), the courts must determine that there is a compelling governmental interest before the State or any of its political subdivisions can burden the exercise of religion. Thus, the court must apply strict scrutiny where religious exercise is at issue. Section 52-571b (d), however, provides that the State or any of its political subdivisions may not "burden any religious belief. . . ." In order to determine which standard to apply in the present case, the court must identify whether the religious healing ritual constitutes a religious exercise or religious belief.

The Appellate Court stated in *Rweyemamu* that the "religious practices" which § 52-571b was intended to protect include the ritualistic use of peyote at issue in *Employment Division, Dept. of Human Resources of Oregon* v. *Smith*, supra, 494 U.S. 872, as well as "the lighting of candles in church, the receiving of wine at holy communion, wearing a yarmulke in court . . . forcing the Amish to use reflectors on their horse drawn buggies . . . ." [*Rweyemamu* v. *Commission on Human Rights & Opportunities*, supra, 98 Conn. App. 664 n.10]. The court, however, acknowledged that the "internal governance of a religious institution, including the employment of ministers and clergy, is a protected religious belief"; id., 662; and that "the language of [§ 52-

571b (d)] prevents the application of the strict scrutiny test of subsections (a) and (b)." Id., 665. As a result, § 52-571b requires that the court apply strict scrutiny before allowing State actors to burden the exercise of religion, whereas federal law allows the government to burden religious exercise if it can apply neutral principles of secular law.

In the present case, it is clear that the plaintiff's allegations, sounding in clergy malpractice and relating to the performance of a religious healing ritual, falls under the category of religious exercise and not religious belief. The defendants argue that the plaintiff's claims involve religious beliefs similar to the plaintiff's claim in *Rweyemamu* v. *Commission on Human Rights & Opportunities*, supra, [98 Conn. App. 646], asserting that "like the employment practices of a religious institution, a religious worship service is an expression of the church's religious beliefs" under § 52-571b (d). The subject matter at issue in this case, however, falls squarely under the category of religious exercise and not religious belief. The lighting of candles in church and the receiving of wine at holy communion, much like the religious healing ritual at issue in this case, are expressions of religious exercise that usually take place in accordance with events that are ceremonial in nature. Accordingly, since the plaintiff's claims are based on religious exercise and not religious belief, they are subject to strict scrutiny pursuant to § 52-571b (a) and (b). There is no showing, however, that there is a compelling State interest in permitting the court to evaluate the plaintiff's claims in this case. The plaintiff cites no authority in support of the proposition that her claims may pass strict scrutiny. As a result, even though the conduct complained of constitutes religious exercise and not religious belief, her claims do not pass the strict scrutiny test and cannot proceed.

The plaintiff argues that her causes of action are constitutional because § 52-571b is inapplicable to this

case. Specifically, she states that the constitution of Connecticut, article first, § 3, contains a "public safety exception" which permits her to bring her causes of action. General Statutes § 52-571b (a) states: "The state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the Constitution of the state even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section." Article first, § 3, provides: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state; provided, that the right hereby declared and established, shall not be so construed as to excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the state."

It appears that the plaintiff attempts to argue that her claims are constitutional simply because the defendants' negligence jeopardized the plaintiff's safety. Again, no authority is provided for the argument that the defendants' alleged negligence in this case constituted practices "inconsistent with the peace and safety of the state" such that it would be constitutional to allow her to continue with her causes of action. She provides no authority to support her proposition that this section of the State Constitution allows her to file negligence claims notwithstanding the language of § 52-571b.

Since the plaintiff's allegations involve issues of religious exercise, the court has applied the strict scrutiny test and determined [that] the plaintiff has failed to show a compelling State interest in adjudicating her claims in the present case. Therefore, her complaint is not permitted in light of the defendants' right to religious exercise pursuant to § 52-571b.

## CONCLUSION

For the foregoing reasons, the court grants the defendants' motion to dismiss.